561 So.2d 986 (1990)
Jerry CELESTINE, Guy Burns, and Rodney Klein
v.
UNITED STATES FIDELITY & GUARANTY COMPANY, David C. Carson and Communication Wiring Service, Inc.
No. 89-CA-1379.
Court of Appeal of Louisiana, Fourth Circuit.
May 15, 1990.
Douglas A. Allen, Jr., Metairie, for defendants/appellants.
Richard S. Vale, Blue, Williams & Buckley, Metairie, for defendants/appellees.
*987 Before LOBRANO, ARMSTRONG, JJ., and HUFFT, Judge Pro Tempore.
ARMSTRONG, Judge.
This case arose out of an October 14, 1985 vehicular accident involving a truck belonging to the New Orleans Sewerage & Water Board ("S & WB"), which was being driven by one of its employees, and a vehicle owned and driven by David C. Carson. The driver of the S & WB truck, Rodney Klein, and his two passengers, Jerry Celestine and Guy Burns, also S & WB employees, filed this suit against Carson, his employer (a corporation solely owned by Carson), and the corporation's insurer, United States Fidelity & Guaranty Company ("USF & G"), seeking damages for personal injuries sustained by them in the accident. Carson reconvened alleging negligence on the part of Klein, and filed a third-party demand against the S & WB and its insurer. USF & G reconvened seeking reimbursement for sums paid for the property damage to Carson's company vehicle, and for Carson's medical expenses.
Klein, Celestine and Burns settled their claims before trial. Following trial, a jury found that Carson had been 70% at fault in causing the accident, Klein, 30%. The jury determined that plaintiff suffered $15,000.00 in total damages, none of which were for future medical expenses. Carson now appeals, raising two assignments of error.
Appellant's first assignment of error concerns a statement made by opposing counsel in his closing argument. Although the transcript in the record does not contain the closing arguments of counsel, it does contain appellant's objection, and argument of counsel on the issue. In his brief on appeal appellant claims that opposing counsel stated that Celestine, Burns and Klein had "no interest in the case, no reason to lie, and asserted that they were without bias."[1]
The credibility of the three S & WB employees was important because their version of the accident conflicted with that of the appellant on one crucial point. Appellant testified that he was in the right-hand lane of a two-lane street when the S & WB truck, traveling in the same direction but in left-hand lane, swerved into his lane and caused the collision. The S & WB employees all testified that they had been in the right-hand lane when they had to suddenly stop to avoid striking the vehicle in front of them which had stopped. In their version of the story, when they stopped, Carson rear-ended them.
Following the court's charge to the jury, appellant objected to the statement, arguing that the jury should have been told that the men were all plaintiffs at one time, and thus had an interest. The trial judge stated that if the jury had been told this, and had explained to it that the three men settled their claims with appellant's insurance company before trial, appellant would have been more prejudiced than he would have been had nothing further been said on the subject.
On appeal appellant asserts that opposing counsel's comment "was so unfair as to mandate a new trial."[2] We disagree. First, appellant cites no rule, and we can find none, which would operate to prevent opposing counsel from making such a comment. Also, in one sense the comment was accuratethe three men had no monetary interest in the case, and thus had no reason to lie for financial gain.
Appellant claims that he was prejudiced by the comment because it was made in closing argument and he did not have an opportunity to cross-exam the witnesses to show interest or bias, by for instance, bringing out before the jury that the men had previously given depositions under oath, and thus had to parrot their previous statements at trial or risk opening themselves up to a charge of perjury. Again, appellant cites no rule, and we can find *988 none, which would prevent this type of general comment in a closing argument. Moreover, on cross-examination, counsel for appellant brought out that all three men had given statements about the accident to their employer. Thus, the jury was aware that the men were "locked into" a previous statement. Also, in his cross-examinations of these witnesses, counsel for appellant could have simply asked if they had previously given depositions in the case. It would not have been necessary to bring out that they had been plaintiffs who had settled their claims with appellant's insurerbeing witnesses to and participants in the accident, they were logical deponents.
While it is understandable that appellant's counsel would not want it brought out that his client's insurer had settled with the S & WB employees, and opposing counsel was prohibited from bringing this out as evidence of liability, it was a permissible and strategic move by opposing counsel to comment on the lack of interest and bias on the part of the witnesses, insofar as the evidence before the jury.[3] We find no merit to appellant's claim of error as to this issue.
By his second assignment of error appellant claims that, considering the law and evidence, the jury award for general damages was too low, and damages for future medical expenses should have been awarded.
A trier of fact has much discretion in the assessment of general damages. La. C.C. art. 2324.1; Landy v. Smith, 542 So.2d 731 (La.App. 4th Cir.1989). Before an appellate court can disturb a trial court's award of general damages, the record must clearly reveal that the trier of fact abused its discretion in making the award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Harris v. Doucette, 539 So.2d 997 (La.App. 4th Cir.1989). If such an abuse of discretion is found, the court may look to other awards made in similar cases as an aid to raising or lowering the award to its highest or lowest point which would have been reasonably within the discretion of the jury. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., supra; Harris v. Doucette, supra.
Officer Ronald Recassner wrote the accident report. His report indicated that he asked the appellant whether he had any injuries, to which appellant replied in the negative.
Dr. Ralph Gessner, an orthopaedist, examined appellant on November 6, 1985, less than one month after the accident. At that time appellant was complaining of neck and shoulder pain. The history given by appellant related the accident of October 14th, as well as a strained neck some four and a half years previously for which he received chiropractic treatment. Appellant also related that he had seen a chiropractor after the accident in question. Upon examination, Dr. Gessner found muscle spasm in appellant's neck. Dr. Gessner stated that spasm was an objective symptom of trauma. He diagnosed appellant to be suffering from cervical strain and a contusion to the left shoulder. He prescribed anti-inflammatory and pain medication, and restricted his physical activity. Dr. Gessner stated that the normal prognosis for this type of case for a young healthy male would be three to six months recovery, with no permanent disability.
Although Dr. Gessner was to have seen appellant in three weeks, appellant did not return to him until October, 1986, almost a year later. At this time Dr. Gessner noticed that appellant had a moderate degree of atrophy in his shoulder muscles. Diagnostic testsa CT scan and an MRI showed an asymmetrical bulging of the disc between the fifth and sixth vertebra in appellant's neck, or a herniated disc. Dr. Gessner opined that about one third of the population appellant's age would show some evidence of bulging on an MRI test and admitted that clinically, appellant was "neurologically intact"only the tests showed a herniation. He said appellant's initial complaint was consistent with the *989 bulge in the disc. Dr. Gessner subsequently sent appellant to another orthopaedist, Dr. David Kline, for treatment of his shoulder.
Dr. Gessner testified that if his spinal conditionthe ruptured disccontinued to worsen, which he said in most cases it does, appellant would have to undergo an anterior cervical fusion. If he did need it, Dr. Gessner said, it would be within the next five years. He placed the odds at sixty to forty that he would need the surgery, which he estimated would cost, including hospitalization, $20,000.00.
Dr. Kline first examined appellant on November 11, 1986. Dr. Kline testified that an EMG study showed a lack of nerve input to two muscles in the back of appellant's shoulder. The nerve was being pinched or scissored. This had caused these particular muscles to visibly atrophy. Dr. Kline operated on the shoulder to free the nerve. He said these operations usually lasted about a couple of hours followed by a couple of days in the hospital and a couple of days of rest at home.
Based solely upon the history given by appellant, Dr. Kline said that somehow the accident precipitated the problem, but was not the total cause of it. Some people, he said, are predisposed to this type of nerve problem. He estimated that in fifty percent of the cases, the symptoms arise spontaneously; in the other fifty percent, it is related to some trauma involving the neck, shoulder, and/or arms. He also said he had seen this type of condition in people who lift weights (appellant used to lift weights a number of years before the accident). He last saw appellant in December, 1987, when he had almost fully recovered the full use of his affected shoulder muscles. He stated that as of the date of trial, January 26, 1989, the muscles "should be perfectly normal" or "almost normal."
Dr. Robert Applebaum, a neurologist, examined the appellant in connection with this litigation. He saw him once, on December 6, 1988. At that time appellant was complaining of stiffness in his necka "steady discomfort." Appellant related the condition to the October, 1985 automobile accident. Dr. Applebaum noted tenderness around the neck and shoulder blade. Further examination revealed a normal range of motion in the neck, no muscle spasm, and no pain or discomfort upon compression of the cervical spine. He found "minimal wasting" of the right shoulder musclethere was not as much muscle on that side compared to the left, but Dr. Applebaum noted that appellant had regained almost complete strength.
Dr. Applebaum stated that his exam did not reveal any significant mechanical or neurological findings. He said the absence of mechanical findings ruled out any neurological problems. He said that the MRI taken by Dr. Gessner showed "minimal bulging", but no herniation. Dr. Applebaum said that as people get older you frequently see bulging, the result of degenerative changes. The bulge revealed by the MRI was on the left side; Dr. Applebaum admitted that if there had been an injury which caused a ruptured disc, the rupture would be to one side or the other.
Nevertheless, Dr. Applebaum maintained that the appellant did not have a herniated/ruptured cervical disc. He said that although appellant's complaints of neck pain had been consistent, and that if truthful, would be indicative of injury, the complaints and tests didn't match up.
Dr. Applebaum assessed a five to ten percent medical impairment for appellant's shoulder condition, but placed no limitations on appellant's work activities. He assessed no impairment for appellant's neck. Because he felt that appellant did not have a herniated disc in his cervical spine, Dr. Applebaum, as opposed to Dr. Gessner, saw no need for any type of surgery.
Appellant testified that as best he could recall, he absorbed most of the impact of the accident in his arms and shoulders as he braced himself by gripping the steering wheel. He said he did not believe that he hit his head. He admitted telling the investigating police officer that he did not think he was injured, but said two days later he began experiencing "a lot of soreness and stiffness," and went to see a chiropractor.
*990 Chiropractic treatment did not help so he went to see Dr. Gessner, and later, Dr. Kline, who operated on his shoulder. Four months after the accident he began experiencing numbness in two fingers of his right hand.
A former recreational weightlifter, appellant said that in September, 1986, while lifting weights for the first time in a number of years, he noticed he couldn't lift as much as he used to. At that time a friend noticed a depression in his shoulder. This was where the muscles had atrophied. As of the time of trial, appellant stated that he felt that the strength in his shoulder had returned to only fifty percent of what it had been before the accident. However, he based this supposition on his being able to bench press a weight of only 130 pounds, where he was able to press in excess of 300 pounds when regularly lifting weights some ten years earlier.
He said that the pain he experiences "always" affects his mental or personal attitude throughout the day. The pain causes him to be fatigued in the early evening, and also affects his sleeping. He has pain medication but does not take it because it makes him drowsy. Appellant, who is employed by his own company, said that since the accident he has worked fulltime (8 to 10 hours a day) except for doctor's appointments, and we presume, his surgery and recovery. Appellant is not physically limited in his work by any condition allegedly caused by the accident. But, based upon what he says is a herniated disc, Dr. Gessner stated that appellant should restrict his lifting to no more than twenty or thirty pounds, and not do that on a repetitive basis.
Appellant said that before the surgery on his shoulder, and recuperation, he had problems doing ordinary tasks such as lifting bags of groceries up to the trunk of his car. He also testified that as a result of the problems experienced by him after the accident, he feels that he does not have the drive to succeed at his business that he used to.
It was stipulated by appellee, as to the amount, that appellant's medical bills following the accident totalled $8,984.00. It was further stipulated that the amount of property damage to appellant's vehicle sustained in the accident was $1,464.20. USF & G, as appellant's insurer, sought reimbursement for payment of these amounts, a total of $10,448.20.
The total jury award for general and special damages, excluding future medical expenses, was $15,000.00. Since appellant was found to be seventy percent at fault, only thirty percent of the award, $4,500.00, was to go to him, less any amount due USF & G. The final judgment reflects that it was assumed by the trial court that the jury found the appellant suffered as damages, the full amount of his medical expenses, as well as the full amount of property damage to his vehicle, a total of $10,448.20. $10,448.20 is approximately sixty-nine percent of $15,000.00. Sixty-nine percent of $4,500.00 is $3,105.00in its final judgment the trial court awarded USF & G $3,104.40. Appellant was awarded $1,395.60, or approximately thirty-one percent of $4,500.00.
Because the jury interrogatories did not request a separation of general and special damages, it is impossible to accurately determine the amounts awarded for each category. Since the trial court issued its final judgment based upon the assumption that the full amount of special damages was awarded, we will continue with that fiction. Subtracting the total amount of special damages, $10,448.20, from the total damage award, $15,000.00, we see that the jury awarded only $4,551.80 in general damages.
The award of damages was primarily dependent upon the testimony of the medical experts. The record reflects that Dr. Gessner examined appellant only a handful of times, although tests were also performed by him or at his direction. Dr. Applebaum examined the appellant once, at the behest of the appellee. His actual physical examination of appellant took only about ten minutes. Generally, the testimony of a treating physician should be accorded greater weight than that of a physician who examines a patient for diagnostic purposes *991 only. See Lewis v. Alloy Casting of La., Inc., 465 So.2d 847 (La.App. 2d Cir. 1985); Ellis v. Rapides Parish School Board, 419 So.2d 990 (La.App. 3rd Cir. 1982). However, the treating physician's testimony is not irrebuttable, and the trier of fact is required to weigh the testimony of all medical witnesses. S.J. v. S.M., 505 So.2d 897 (La.App. 2d Cir.1987), writ denied, 507 So.2d 229 (La.1987).
In the instant case the general rule really has no application as to the credibility given to Dr. Gessner's testimony versus that of Dr. Applebaum, concerning the appellant's cervical spineDr. Kline was clearly the physician who was primarily responsible for treating appellant for his shoulder condition. Other than the strained neckevidenced by muscle spasmfound by Dr. Gessner on appellant's first visit, the opinions of both Dr. Gessner and Dr. Applebaum were based upon diagnostic tests. These tests, while performed on the order of Dr. Gessner, were reviewed by him in the same way they were reviewed by Dr. Applebaum. Dr. Applebaum was just as qualified to interpret the results of the tests as was Dr. Gessner. For these reasons we believe the jury could have accepted Dr. Applebaum's opinion over that of Dr. Gessner, even though Dr. Applebaum only examined appellant one time, for diagnostic purposes.
Based upon the testimony of Dr. Applebaum, the jury could have found that the appellant did not suffer any damage to his neck and cervical spine, other than perhaps a strain. The jury could have concluded that the bulge of the disc between the fifth and sixth vertebra of his cervical spine was due to degenerative changes, not the accident. Such a finding is supported by the record evidence and can not be considered clearly wrong. See Canter v. Koehring Company, 283 So.2d 716 (La. 1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
If the jury determined that appellant sustained only a strained neck as a result of the accident, it could have awarded appellant a minimal sum for pain, discomfort and other general damages. In addition, because there would be no need for future surgery on appellant's cervical spine, no award was made for future medical expenses.
Both Dr. Gessner and Dr. Kline linked appellant's shoulder/nerve condition with the accident. Although it was stated that the condition occurred spontaneously in perhaps fifty percent of affected persons, the evidence strongly supported a causal link between the accident and the manifestation of appellant's symptoms. Even though Dr. Kline said that he had seen the condition in weightlifters, and appellant had lifted weights in the past, he had apparently not lifted weights for almost ten years before the accident. Dr. Kline did say that the appellant probably had a congenital condition that made him susceptible to this type of condition. However, it is well settled that a tortfeasor is responsible for the consequences of his tort although those damages are greater because of a pre-existing condition. Reck v. Stevens, 373 So.2d 498 (La.1979); Kuck v. City of New Orleans, 531 So.2d 1142 (La.App. 4th Cir.1988).
Appellant underwent a two hour operation on his shoulder. This operation was performed in January, 1987, approximately fifteen months after the October, 1985 accidentappellant stated that he began experiencing pain and discomfort shortly after the accident. After a short recovery period the appellant began regaining strength until, according to Dr. Kline, by the time of trial he should have almost fully recoveredat the time of his last exam in December, 1987, appellant had almost fully recovered. But, Dr. Kline did assess a five to ten percent "medical impairment" to the appellant because of his shoulder.
Based upon this evidence we feel the total jury award for general damages, $4,551.80, is on the low side, and an abuse of the "much discretion" afforded the trier of fact. We must now raise the award to the lowest point which would have been within the discretion of the jury. We have determined that the jury could have awarded appellant general damages for a strained neck and the shoulder injury, *992 which required invasive surgery. The cases cited by appellant concern awards for much more severe injuries than these. After reviewing a number of cases where awards have been made for these two types of injuries, we feel that $10,000.00 is the lowest amount of general damages which the jury could have awarded. The judgment of the trial court will be amended accordingly.
Adding this amount of general damages, $10,000.00, to the amount stipulated as special damages, $10,448.20, gives us a total of $20,448.20. Appellant's thirty percent share equals $6,134.46. This is $1,634.46 more than his share of the original jury award, of which USF & G received $3,104.40. Since USF & G did not appeal, appellant is entitled to this $1,634.46, added to the amount awarded to him in the final judgment of the trial court, $1,395.60, for a total of $3,030.06.
For the foregoing reasons, we amend the final judgment of the trial court to award appellant, David C. Carson, a total of $3,030.06, plus legal interest from the date of judicial demand. We affirm the judgment of the trial court in all other respects. Costs of this appeal are assessed to defendant-appellee.
AMENDED, AFFIRMED AS AMENDED.
NOTES
[1] Appellee admits as much, stating that its "comment basically said that these three parties were not interested in the case, had no reason to lie, and thus were without bias."
[2] The appellant did not move for a mistrial after the statement was made; nor did he file a motion for a new trial after the verdict was returned.
[3] Evidence of a settlement, or payment of expenses incurred as a result of a personal injury, is not admissible to prove liability. See Louisiana Code of Evidence arts. 408(A) and 409.