Judge Regina Bartholomew-Woods
In this consolidated appeal, Plaintiffs-Appellants, Grace Buggage, Rodney Buggage, and Gail Holmes appeal the July 25, 2016 judgment of the district court in favor of Defendants-Appellees, Touro Infirmary and Healthcare Casualty Insurance Company, denying their claims. For the reasons that follow, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
On August 19, 2005, Mrs. Annabelle Buggage, age 72, was admitted to the care of Touro Infirmary ("Touro") for an infection and ulcer in her left little toe. Further evaluation revealed the toe to have a number of infections, including Methicillin-resistant Staphylococcus aureus ("MRSA"). X-ray scans also revealed osteomyelitis, or bone infection. Mrs. Buggage began a treatment regimen of antibiotics and hyperbarics, and remained at Touro as Hurricane Katrina ("Katrina") made landfall in New Orleans on August 29, 2005. As a result of the storm, Touro sheltered in place and discontinued all "non-essential" services to patients in its care, including those being provided to Mrs. Buggage. City services, including electrical power and water service failed in the aftermath of the storm and levee failures, which lead to the evacuation of the hospital. Ms. Buggage was evacuated to Houma, from where she was transported by family members to Piedmont Atlanta Hospital in Georgia. There, she underwent surgery during which doctors removed her little *758 toe down to the metatarsal bone, or the "knuckle" of the toe.
Mrs. Buggage passed away in October 2009, and Plaintiffs filed suit in January 2014. Based on theories of negligence and premises liability, Plaintiffs argued that had Touro been adequately prepared for Katrina, Mrs. Buggage would have been evacuated prior to Katrina's landfall and transferred to an acute-care facility that would have provided continual treatment for her toe, eliminating the need to amputate it down to the metatarsal bone.
The district court presided over a bench trial from May 2 through 4, 2016, rendering a final written judgment and reasons therefor on July 25, 2016.
In its reasons for judgment, the district court reasoned that "Touro's plan complied with [the] Joint Commission [on Accreditation of Healthcare Organizations, or "JCAHO"], [as well as] state, and federal requirements for hospital emergency preparedness." The court pointed to testimony indicating that Touro had a "written Hurricane Management Plan" as well as an unwritten evacuation plan, and that there was no evidence that a written evacuation plan would have changed the outcome for Mrs. Buggage. The court also noted testimony indicating that the hospital had adequate water, food, and medical supplies throughout the storm up to the evacuation. The court was also not convinced Touro provided inadequate ventilation, or that the lack of running water or air conditioning presented an unreasonably dangerous environment. Further, the court observed that it was common, at the time, for hospitals to shelter in place, and that a total hospital evacuation presented its own risks. The court further indicated that had it found a breach of a duty of care, it could find no basis for finding the breach caused the ultimate amputation or extent thereof, as all the doctors present at trial agreed that Mrs. Buggage's toe could not be revitalized. The court also pointed to other health conditions that may have contributed to the amputation of Mrs. Buggage's toe, including, but not limited to, hypertension, diabetes, and osteomyelitis. Ultimately, the court concluded that it was more probable than not that amputation would have been required even if Hurricane Katrina had not struck.
STANDARD OF REVIEW
This is not a medical malpractice claim. Appellants proceeded to trial alleging ordinary negligence and premises liability. Accordingly, as to negligence, this Court
may not set aside the findings of fact made by a jury or trial court unless those findings are clearly wrong or manifestly erroneous .... In order to find that the factfinder's determinations were manifestly erroneous or clearly wrong: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong or manifestly erroneous.... The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one.
Johnson v. Ray , 2012-0006, 2012-0007, p. 6 (La.App. 4 Cir. 12/5/12), 106 So.3d 629, 635 (internal citations omitted). We apply the same standard to Appellants' premises liability claim. Broussard v. State ex rel. Office of State Bldgs. , 2012-1238, p. 13 (La. 4/5/13), 113 So.3d 175, 185-86.
*759 To prove a negligence[1] claim, Plaintiffs were required to show that Defendant had a duty to conform its conduct to a specific standard of care, that Defendant's conduct failed to conform to the appropriate standard of care, that Defendant's substandard conduct was a cause-in-fact of the plaintiffs' injuries, that Defendant's substandard conduct was a legal cause of the plaintiff's injuries, and that Plaintiffs were damaged. Falcone v. Touro Infirmary , 2013-0015, 2013-0016, p. 4 (La.App. 4 Cir. 11/6/13), 129 So.3d 641, 645. "Factual findings, including breach of duty, cause-in-fact, and legal causation, are subject to the manifest error standard of review." Id. , 2013-0015, 2013-0016,p. 14, 129 So.3d at 650.
In pursuing their claim of premises liability,[2] Plaintiffs were required to show "1) that the thing was in the owner's or custodian's garde; 2) that the thing contained a vice or defect creating an unreasonable risk of harm; and 3) that the damage was caused by the vice or defect." Alexander v. Hancock Bank , 2016-0662, p. 5 (La.App. 4 Cir. 2/8/17), 212 So.3d 713, 717.
THE TRIAL
Plaintiffs called Frank Hijuelos, former director of emergency operations for the City of New Orleans from 1998 to 2001. He testified that in that role, he was tasked with assisting in the development of a hurricane emergency preparedness plan for local hospitals, and that CEOs from all local-area hospitals gathered to meet to discuss such plans in the event of a category three, four or five hurricane. He testified that he had "no doubt" that Touro representatives attended those meetings, as both the State and City mandated participation. He explained that officials from the hospitals were advised of the consequences of such a hurricane, and that the only safe place would be outside the City. In the event of an evacuation order, hospitals were advised that they should discharge all patients except those at risk of death if transported. They were also advised not to expect city services or utilities, and that generators below the second floor of a building could end up under water. Mr. Hijuelos did acknowledge, however, that the plans developed contemplated the overtopping of levees, not their total failure, as occurred during Katrina.
Plaintiffs next called Scott Landry, Director of Facilities Management at Touro during Katrina. In that role, Mr. Landry was responsible for plant operations and maintenance, including preparing the hospital for an incoming hurricane. He testified that he participated in meetings of the Metro Hospital Council, where he was advised of the consequences of a storm as powerful as Katrina was expected to be, and he in turn advised Touro CEO Leslie Hirsch of the "worst case scenario" in the days leading up to Katrina's landfall. He further testified that Touro's lack of a written evacuation plan violated the standards *760 of the JCAHO. However, Touro acquired bottled water, emergency power generators, and fifty (50) spot coolers in anticipation of the storm.
Plaintiffs next submitted the deposition of Leslie Hirsch, who began as Touro's CEO one week prior to Katrina's landfall. Mr. Hirsch testified that Touro had never fully evacuated, and that such action was not contemplated in the face of Katrina. He explained that the hospital did lose power and water, though it was the first time in Touro's history that it had experienced a total loss of water services. He explained that the generators began to fail after the levees broke, and that he ultimately made the decision to evacuate due to the loss of water and backup power. He testified that Touro had adequate food, water, and medicine up to the time of evacuation.
Sethany Johnson, a registered nurse employed by Specialty Hospital of New Orleans at the time of Katrina, testified that in the aftermath of Katrina, Touro was extremely hot and humid. She stated the toilets stopped flushing, and that bottled water ran out. She testified that there was no ventilation aside from within the hospital stairwells.
Dr. Ira Markowitz, a board certified vascular surgeon, testified that he was Mrs. Buggage's admitting physician at Touro on August 19, 2005, and that she presented with a draining ulcer on her toe. He noted her toe was red, tender, and painful. Mrs. Buggage was admitted after it was discovered she had MRSA. He noted that Mrs. Buggage had diabetes that was not well-controlled, as well as hypertension. He explained that the combination of conditions put her at risk for limb loss, and she was therefore placed on multiple medications. He ultimately diagnosed her toe condition as cellulitis of the foot and osteomyelitis. He also consulted with Dr. Shiva Akula, an infectious disease specialist, who recommended partial amputation of the foot. However, Dr. Markowitz disagreed with that assessment, suggesting he wished to avoid removing any part of her foot surgically. Thus, he began Mrs. Buggage's treatment with antibiotics and began evaluating her for hyperbaric treatment, which involved placing her in an oxygen chamber to increase oxygen flow to her foot. Mrs. Buggage responded positively to the oxygen treatments, such that Dr. Markowitz believed the tip of her toe would "auto-amputate." Dr. Danilyants, the director of the hyperbaric unit at Touro, indicated in his reports that Mrs. Buggage was receiving an "excellent result" from the treatment. Dr. Markowitz was of the opinion that without continued antibiotic and hyperbaric treatment, Mrs. Buggage's condition would have worsened. He further opined that the ultimate amputation of her toe at Piedmont could have resulted in the need for further subsequent amputation of her other toes.
Dr. Kevin Stephens, board certified in obstetrics and gynecology as well as "quality assurance and utilization review," testified next. He was qualified by the court as an expert medical doctor and in emergency management preparedness. He testified that heat, such as that present at Touro during Katrina, could lead to dehydration, which would have further compromised Mrs. Buggage's condition. He further explained that such heat increases one's need for oxygen, which could render one more susceptible to infection and exacerbate her diabetic condition. He gave his professional medical opinion that Mrs. Buggage's condition worsened as a result of the conditions she experienced at Touro. He opined that the conditions at Touro were "unreasonably dangerous" and that Touro should have evacuated all those patients whose lives would not have been threatened by *761 the process prior to the storm's landfall. On cross-examination, Dr. Stephens acknowledged that Mrs. Buggage was never formally diagnosed as "dehydrated," and that even had she continued her treatment as prescribed, she "still could have lost her little toe." On re-direct, he asserted that even though amputation may have been necessary, he was of the opinion that her experience at Touro required a more extensive amputation.
The defense case began with Dr. Akula, who was accepted by the court as an expert in internal medicine and infectious disease. He provided a consult to Dr. Markowitz upon Mrs. Buggage's admission, and was of the opinion that Mrs. Buggage's toe would require at least some amputation. However, he would have deferred to the surgeon regarding the extent of amputation.
The defense next presented John Huerkamp, the Chief Operating Officer for the New Orleans Sewerage and Water Board at the time of Katrina. He explained that Katrina's floodwaters entered the basement of the Carrollton Water Purification Plant, which prevented it from pumping fresh water to Touro as of 5:00 p.m. on August 31, 2005. He testified the plant had never previously flooded.
The defense also called Cynthia Davidson, the Regional Emergency Coordinator for hospitals for the Department of Health and Hospitals for the region encompassing New Orleans, who was admitted as an expert in hospital emergency preparedness. At the time of Katrina, her job consisted of assisting and coordinating with hospitals to meet guidelines to receive grant money from the Department of Health and Human Services relative to emergency preparedness. She was employed through the Louisiana Hospital Association, and testified that the goals under the grant were "married with" the goals of the JCAHO. She explained the JCAHO is the accrediting organization for hospitals, which in turn allows those accredited hospitals, like Touro, to collect money from the federal government. She explained that the common practice in 2005 was for hospitals to "shelter in place" during storms, with adequate supplies for three days. She testified that all local-area hospitals sheltered in place for Katrina. Furthermore, she stated there existed no requirement under the JCAHO standards for hospitals to provide air conditioning in 2005 in the event of a loss of power. On cross-examination, she acknowledged that Touro failed to comply with the JCAHO requirement to have a written evacuation plan.
The defense next presented the testimony of Dr. Patrick Battey, who was accepted as an expert in vascular surgery. In 2005, he worked at Piedmont Atlanta Hospital, and examined Mrs. Buggage upon her arrival. He diagnosed her with peripheral vascular disease, which he attributed to her history of diabetes and hypertension. He found the description of Mrs. Buggage's toe in the Touro records to be "similar" to how it presented upon her arrival at Piedmont. He was of the opinion that, at the time Mrs. Buggage entered Touro, the only remedy would be to remove her toe, which he ultimately did, removing her toe down to her metatarsal bone. He continued to see Mrs. Buggage after this initial surgery, and testified that as a result of her pre-existing health conditions, she required amputation of all of her toes from both of her feet.[3] He opined that *762 Mrs. Buggage's lack of antibiotics and lack of hyperbaric treatment had no detrimental effect on her condition. As to the latter treatment option, he stated hyperbarics could aid the healing process after surgery, but it would not have revascularized the already dead tissue on her toe. As for both treatment options, he stated neither would have treated Mrs. Buggage's osteomyelitis. He did concede on cross-examination that Mrs. Buggage's experience at Touro could have necessitated taking off more of the toe at Piedmont.
The defense also presented the testimony of Dr. Robert Batson, a board certified vascular surgeon, who was accepted as an expert in the field. Dr. Batson reviewed medical records and depositions relative to Mrs. Buggage's treatment, but did not treat or examine her himself. He did state he had treated patients with Mrs. Buggage's conditions, and would have initially prescribed broad-spectrum antibiotics, but not hyperbaric treatment. Dr. Batson appeared most concerned about Mrs. Buggage's osteomyelitis, which he described as a "deep bone infection." He also reviewed an angiogram of Mrs. Buggage's leg which revealed advanced arterial blockage far down into her leg into the area of her ankle. He further noted that the infection in the bone had progressed first through her tendons, thus compromising them. In his opinion, the toe infection could have been a precursor to something worse. Therefore, he believed that based upon her condition when she first presented to Touro, the proper course of treatment would have been to remove her toe down to the metatarsal bone, and that to remove anything less could have jeopardized the toe amputation. He stated that the surgery ultimately performed by Dr. Battey constituted "standard treatment" and was "the right thing to do." Based on this analysis, Dr. Batson could attribute no detrimental effect to Mrs. Buggage's lack of continued antibiotic or hyperbaric treatment at Touro during Katrina.
ANALYSIS
Assignment of Error No. 2
We begin our analysis with Appellant's second assignment of error. Therein, Appellants argue that the district court erred in failing to give proper weight to the testimony of Mrs. Buggage's treating physicians relative to the testimony of her non-treating physicians.
In evaluating the testimony of the numerous physicians in this case, this Court is well-aware of the principle that a treating physician's testimony is entitled to greater weight than that of non-treating physicians. Falcone , supra , 2013-0015, 2013-0016,p. 16, 129 So.3d at 651. However, we also recognize that a "treating physician's testimony is not irrebuttable, and the trier of fact is required to weigh the testimony of all medical witnesses." Williams v. Wal-Mart Stores, Inc. , 2000-0863, p.6 (La.App. 4 Cir. 5/16/01), 787 So.2d 1134, 1137 (citing Celestine v. U.S. Fidelity & Guaranty Co. , 561 So.2d 986, 991 (La.App. 4 Cir.1990) ).
While Dr. Markowitz, Mrs. Buggage's treating physician, testified that Mrs. Buggage was responding well to antibiotic and hyperbaric treatment, which was echoed by Dr. Danilyants, he also acknowledged that Mrs. Buggage's combined conditions of poorly-controlled diabetes, hypertension, and distal arterial disease put her at risk of limb loss. He also acknowledged Mrs. Buggage's osteomyelitis. Dr. Markowitz is the only doctor who testified that *763 surgical amputation was not his preferred course of treatment, though he did advocate for auto-amputation of the portion of Mrs. Buggage's toe that could not be revitalized through any treatment. Nonetheless, even had treatment continued as planned, Dr. Markowitz could not rule out the possibility that Mrs. Buggage would still lose her toe as she did. Furthermore, Dr. Akula also viewed Mrs. Buggage's toe upon admission at Touro, and opined that amputation would be the appropriate course of action.
The district court also had the benefit of the testimony of treating physician Dr. Battey. His review of the records from Touro indicated Mrs. Buggage presented at Piedmont in a similar condition as that when she first presented to Touro. He explained that amputation was the only appropriate remedy, and that hyperbarics would perhaps be beneficial post-surgery in the healing process, but not as a treatment plan of first resort. Furthermore, Dr. Battey testified that neither antibiotics, nor hyperbarics would affect Mrs. Buggage's osteomyelitis. Though not a treating physician, Dr. Batson supported the course of treatment undertaken at Piedmont by Dr. Battey. Dr. Batson even opined that the surgery performed weeks later at Piedmont would have been the appropriate treatment for Mrs. Buggage at the time she was admitted at Touro.
In assigning such error, Appellants appear to suggest that conclusive weight should be given to the testimony of those treating physicians who testified in favor of an auto-amputation course of treatment, to the exclusion of all other physicians. However, other treating physicians advocated for the ultimate course of treatment undertaken. The testimony of the non-treating physicians provided additional support and context for the district court, and the district court was well within its authority in considering all relevant medical testimony. Thus, we cannot say that the judgment rendered was in any way improperly deferential to the testimony of the non-treating physicians in this matter.
Assignments of Error Nos. 1, 3, and 4
Appellants' first assignment of error challenges the district court's finding that Touro was adequately prepared for Katrina. In a similar vein, Appellants' third assignment of error challenges the district court's finding that Touro was properly ventilated and that the conditions were not unreasonably dangerous. And, in its fourth assignment of error, Appellants' challenge the district court's finding that Touro did not breach its duty to Mrs. Buggage.
It is not disputed that the conditions in Touro in the aftermath of Katrina were unpleasant, perhaps even unbearable. Indeed, it was the lack of basic services, and the indefinite nature of their resumption, that lead Mr. Hirsch to evacuate the hospital. However, for this Court to entertain Appellant's first, third, and fifth assignments of error would necessarily require this Court to overlook the very testimony the district court chose to credit.
In rendering judgment, the district court pointed to Mrs. Buggage's osteomyelitis, hypertension, and diabetes in concluding that despite what occurred at Touro, Dr. Battey would have had to amputate Mrs. Buggage's toe to the metatarsal bone as he did. Indeed, the district court also noted the fact that Mrs. Buggage eventually required removal of all of her toes, on both feet, as a result of her various ailments as evidence that the events at Touro played no role in what happened at Piedmont just a few weeks later.
Based on the foregoing, whether Touro was adequately prepared, or whether Touro was properly ventilated, or whether the district court erred in finding no breach *764 of duty, is irrelevant. The district court made a determination, with a reasonable basis therefor, that despite Katrina and the events at Touro, Mrs. Buggage's toe required amputation to the metatarsal bone.
Assignment of Error No. 5
Appellant's final assignment of error asserts that the district court improperly applied JCAHO's standards in lieu of statutory law on negligence and premises liability. The district court did indeed refer to the JCAHO standards in its reasons for judgment, but we disagree with Appellants' suggestion that the court's analysis stopped there. Indeed, the district court's reasons for judgment indicate that even had it found a breach of the duty of care in the negligence context, it would not have found causation, based on its conclusion that Mrs. Buggage would have required amputation of her toe despite the events at Touro. Furthermore, in order to prove a premises liability claim, Plaintiffs were required to show that a defect in the premises caused the damage suffered by Mrs. Buggage. For the reasons previously discussed, the district court declined to attribute the damage suffered by Mrs. Buggage to any defect present at Touro, and we find that in so doing, the district court did not err.
CONCLUSION
For the foregoing reasons, we affirm the judgment of the district court in its entirety.
AFFIRMED

A claim sounding in negligence is governed by La.C.C. art. 2315, which provides, in pertinent part, that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

Premises liability is governed by La.C.C. art. 2317.1 :
The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

Plaintiffs' counsel objected to this line of questioning, but the record is unclear as to whether the district court intended to overrule or sustain the objection. The district court did note, however, in its reasons for judgment that Mrs. Buggage's combined health conditions ultimately resulted in the amputation of all of her toes, leading this Court to conclude that the district court overruled the objection.